20-5902 Carl Ward v. Natl Patient Account Svcs Inc. NPAS Inc. Oral argument not to exceed 15 minutes per side. Mr. Parker for the appellant. Good afternoon, Your Honors. Jeffrey Parker for Appellant Carl Ward. May it please the Court. This case arises out of a series of voicemails from Enpass Inc. to my client, Carl Ward, in which Enpass Inc. consistently failed to identify itself as a debt collector and instead stated that it was calling on behalf of Mr. Ward's hospital and also consistently identified itself only as Enpass rather than as Enpass Inc. despite the fact that it shares that name with the abbreviated name Enpass with another debt collector also operating in Tennessee, Enpass Solutions, LLC. Enpass does not dispute nor can it that it violated the FDCPA if it is a debt collector, but it argues that it's not a debt collector because the debts in question here were not in defaults at the time they were obtained by Enpass. Enpass in arguing this is relying on an exception that is one of several Congress enacted in order to ensure that the FDCPA targeted only those debt collectors that lack reputational or customer relations incentives in order to avoid debt collection abuses. Some other examples include exceptions for original creditors and employees of the state and federal government's credit counseling agencies, and Congress included explicitly original creditors who collect in name other than their own in order to ensure that they had it because those individuals do not have a reputational incentive to avoid collection abuse. Now, Enpass relies on Section 692A6F3, which excludes any person collecting any debt quote, to the extent that such activity concerns a debt which was not in default at the time it was obtained by such a person. The statute doesn't define when a debt is in default, but thankfully, the dictionary does. Black's Law Dictionary defines default as omission or failure to perform a legal or contractual duty, especially the failure to pay a debt when due. But when do you think this debt was in default, only apart from any agreement? But I'm just curious, when did it become in default? Your Honor, I don't believe it's possible to answer that question apart from the agreement. The agreement defines when the debt was in default, and the agreement states that the debt was in default effective on the date, actually rather, at 1201 on the day after the date that the charge for service was processed. The agreement provides that patient or guarantor quote, individually promises to pay a patient's account at the rate stated in the hospital's price list effective on the date the charge is processed. And in this case, it is undisputed that that occurred well before the debts were sent to Enpass. That doesn't seem like a normal understanding that a regular consumer would have about when they were in default, that it is when the obligation is promised. You buy something on credit all the time, and you have at least three weeks or so in order to pay your credit card bill. I don't understand how you can say it's in default the minute that the hospital bills the patient. Your Honor, that's because the plain language of the statute requires that conclusion. And also, to talk to your example about a credit card, the contract provides that debt is not due for those three weeks or until the date of the first payment. And sometimes the first payment might be the first day after you use the credit card. So what plain language tells us that it's the day that the hospital puts the bill in the mail? Is that what you're saying? Your Honor, no. What we're saying is that it's the date under this particular contract that the charge for service is processed. And that date is the date on which they actually calculate the bill of Helen's insurance, Mr. Ward's insurance, and before they billed Mr. Ward, both of which they did before they went to Enpass. In the plain language that we're relying on there, it's just the word default. There's only one definition of default that either party argues applies here, and that definition is the omission or failure to perform a legal or contractual duty. And the question is whether, obviously, Mr. Ward failed to perform a legal or contractual duty with respect to these debts. And Blackswath Dictionary defines legal duty and gives us the answer. A duty – let me ask you this. The statute, though, makes a distinction between debt owed or debt due versus a debt in default, doesn't it? Because it defines for a person collecting or attempting to collect any debt owed or due and other to the extent that such activity concerns a debt that was not in default. So the statute itself makes a distinction between when it's due versus being in default. Yes, Your Honor. The statute treats a debt in default as a subset of debt to due, and that's exactly what the standard proposed by Mr. Ward here does. The standard proposed by Mr. Ward here is that whenever the contract says – whenever – actually, a better way to put it is whenever under the contract the cause of action for breach of contract accrues is when the debt enters default. And that's because a legal duty, according to Blackswath Dictionary, is a duty arising by contract or by operation of law, an obligation the breach of which would give a legal remedy. This is incorporated into Blackswath Dictionary's definition of default, which holds that it's the omission or failure to pay a legal or contractual – I'm sorry, perform a legal or contractual duty. So the default under Blackswath is the omission or failure to perform that gives rise to a legal remedy. So what – Parker, what are we to make – I'm sorry, Judge Gilman. Go ahead, Judge Gilman. Judge Gilman, proceed. No, I just had a question about these billing statements that MPAS sent. And they do set forth the payment due date. What are we to make of those due dates which come after the initial – the default date that you would have us accept? Your Honor, it's difficult to say what to make of those because they had absolutely no authority to set due dates that came before they passed the debt back to the original creditor. In fact, it says in the contract that a debt can't be passed due before it's sent back to the original creditor, and yet they set a due date, let it pass, and continued collection activity, and then did it again, and then continued collection activity after the last extension had expired. So it's unclear what those due dates mean other than simply being a misleading attempt to inspire earlier payment. Or rather, they're not technically misleading because the debt was due from the very minute that they calculated the charge for the service process – or process to serve for the service charge. And you can look to Tennessee law for this. For instance, if you look to Todd v. Third National Bank under Tennessee law, it holds that a debt payable on demand, which is precisely what this is, is the cause of action accrues the instant that the right-to-demand payment vests in the original creditor. And that happened when they processed the service charge, and therefore the statute of limitations started running at 12.01 a.m. the next day. Now let me ask you as a practical question. What we're fussing about are two $80 debts. Is that right? That's correct, Your Honor. Why in the world is this suit even being brought over $160? Because, Your Honor, Enpass has attempted to squeeze its entire business model through an exception created for mortgage servicers and not for entities that have no reputational incentive to avoid abusive debt collection practices such as sending misleading final opportunity to settle letters, which they sent and then continued collection activities after despite the fact that they couldn't have charged additional interest under the contract. They have no incentive to do that. And the legislative history, although I don't think we need to look to it because the statute's plain language is so clear, but the legislative history tells us that this subsection was intended for mortgage service companies and other companies that service outstanding debts so long as those debts were not in default when taken for servicing. This is the only place that it uses the term – the legislative history uses the term servicing. And as Judge Clay pointed out, we have a workable definition of servicing in another related statute passed just three years earlier by the same – I guess by the immediately preceding Congress. And that definition says that servicing is taking any periodic payments in pursuant to the terms of a loan. So periodic, ongoing payments pursuant to the terms of a loan. And that's not what Enpass is doing here. And if that's – Getting back to my – you didn't bring this as a class action. So what is your client? Is he trying to avoid the $160, or has he paid the hospital and he's now just suing Enpass? Your Honor, at the time this case was brought, we didn't realize that Enpass didn't think it was a debt collector. We thought this was your ordinary garden-variety, fairly low-value case, and then we discovered that Enpass's entire business model is premised on its idea that it's not part – or not governed by the FDCPA. And we think that argument is frankly flawed. We're also here because Enpass has sought $75,000 in attorney fees below because they argue that this argument could not possibly be brought in good faith. Well, if you prevail, will you be entitled to statutory attorney fees? If we prevail on everything, Your Honor, yes, we'll be entitled to some statutory attorney fees. Well, part of the service of the agreement your client signed, you agreed – Mr. Ward agreed that he would receive letters from Stonecrest or the EBO servicer or a debt collector. He had authorized that, hadn't he? Yes, Your Honor, but he hadn't authorized receiving communications from an entity just identifying itself as Enpass and not Enpass, Inc. He also hadn't specifically authorized Enpass to call him. Enpass isn't mentioned anywhere in the agreement he signed. So he had no idea who Enpass was, and there was a possibility he would accidentally reveal health care information because they represented that they were part of the hospital. He got a letter from – more than one letter from Enpass, Inc., didn't he? Yes, Your Honor, but there's no evidence in the record that he ever saw those letters, and it's unclear whether he did. The voicemails are the basis of the claims. Is there an allegation denying that he received those letters? No, Your Honor. Let me ask you, what about do you have standing? Yes, Your Honor, we believe that we do have standing. In fact, it's fairly clear. The – if you – under Macy is one good place to look. Under Macy, all that is necessary to have standing is the demonstration that there was a distinct risk of harm that was created. And here, not only was there a distinct risk of harm that was created, the harm both of the possibility of confusing Enpass for his hospital because of their representation and failure to disclose they were a debt collector, there was also the actual confusion. Mr. Ward actually sent a letter to the wrong entity because Enpass used the name of another company when it was talking to him. And so he sent a letter to the wrong company trying to invoke his rights under 1692 C.C., and as a result of him sending that letter to the wrong company, he was unable to enforce his rights. That's exactly what Macy's talking about, except in Macy they didn't allege that that actually happened. And here it did. What right could he have to enforce that letter, or did you send the letter, or did the – were you representing him at the time or somebody else? Your Honor, I wasn't representing him at the time. It was his first counsel. And the letter – I apologize – the letter was under 1692 C.C., which allows a debtor or a consumer to enforce a lack of contact. It essentially allows a debtor to say, you may not contact me any further except under four very specific circumstances. Was that letter – was the letter sent by the attorney or by Ward himself? Your Honor, it was sent by an attorney who was retained by Mr. Ward for the purposes of disputing and handling the debt. Maybe it was a poor attorney who didn't read the letter that said – that identified it as Enpass Inc., not Enpass Solutions, LLC. Your Honor, it's my understanding they were working solely from the voicemails, and there's a reason that Congress included in its – in the statute that in any telephone call to a consumer, not even in any communication about a debt, but in any telephone call to a consumer, a debt collector must reveal its true – or must reveal and make a meaningful disclosure of its identity. The only reason Congress could possibly have intended to include that is in order to allow that consumer to enforce their rights under 1692 C.C. and 1692 G.B., which require a And if it's impossible to figure out who just called you, you can't enforce your rights in writing, so they included that to make it possible to figure that out. Well, you think if a voicemail just said Enpass and then any Google thing would have revealed two Enpasses, you'd think he'd send the letter to both, not just to the wrong one. Your Honor, that makes sense, but it's worth noting that the first one that pops up on Google is the wrong Enpass and not the correct Enpass. Mr. Parker, if we were to take – I'm looking at the – I'm sorry. Finish your answer. I apologize. I was going to say that, more importantly, it's the least sophisticated consumer standard that happens here, and I think it's reasonable to assume – or I think it's reasonable to hold that the least sophisticated consumer is going to go with the first debt collection entity that pops up on Google. Well, I wouldn't think that, necessarily. Mr. Parker, I just want to make sure I understand your argument about these billing statements, because my assessment of the billing statements is they do identify Enpass, Inc. in those billing statements. And then if that's the case and Mr. Ward did receive them, he certainly would have had a chance to forward a cease and desist letter to Enpass, Inc. So is it your position that there's just nothing in the record that would indicate that these billing statements were received by Mr. Ward? Is that your argument today? Judge Cole, I would agree with that argument, but I don't think it's necessary because I think that the voicemails themselves violated the FDCPA fairly clearly. And if they violated the FDCPA and there was a real risk of harm because, for example, maybe they had the wrong address for Mr. Ward or Mr. Ward doesn't read his mail for whatever reason, as long as there was a real risk of harm here and there was, in fact, a real risk of harm that was realized, he has standing and there was a violation. The violation of the plain text of 692D6 is obvious. They did not make a meaningful disclosure of their identity. Similarly, E14, they must use their true name. Enpass is not their true name. Enpass, Inc. is their true name. And there's another entity called Enpass. The violations occurred on the voicemails, whether or not the letters were received as a material. Okay. Any further questions? Apparently not. Thank you, Mr. Parker. You have your full six minutes of rebuttal. Ms. Meadows, we'll hear from you next. Good afternoon, Your Honor. Can you hear me okay? Yes. Okay. Thank you. May it please the Court. My name is Megan Meadows, and I represent the affilee Enpass, Inc. I'm going to refer to them as Enpass. Enpass respectfully requests that the Court affirm the judgment of the District Court holding that Enpass is not a debt collector under the FDCPA. Alternatively, Enpass requests that the Court dismiss the appellant's case due to lack of Article III standing. And since we were just talking about it, I'm going to address standing first. As you all know, it's being addressed for the first time on appeal, but because it's a jurisdictional issue, it can be raised at any time. Why didn't you raise it earlier? So the real reason is because this hasn't really become a hot-button issue until recently, and we just didn't raise it. And that may be our fault, but we just chose not to at that point. So to be honest, it was just didn't think of it, I guess. So standing is determined from the face of the complaint. And what I really want to focus on in terms of the standing argument is that the allegations in the complaint asserted by Mr. Ward are what matters here, and they may not be inferred. What counsel's argument states is interesting, but that's not what the complaint actually alleges. The operative pleading alleges three different alleged violations, subsection C-6, E-11, and E-14 of the FDCPA. And as a result, there are three paragraphs in the complaint that provide any allegation as to what potential harm or damage Mr. Ward says occurred. In all three of these paragraphs, paragraph 10, 18, and 28 of the First Amendment complaint, it merely states that plaintiff found the voicemails confusing. Plaintiff was confused as to which entity called. Plaintiff was confused, and it states her, but the ability to enforce her rights was materially affected. Based on these complaint allegations, the only alleged harm is confusion. And while this is a matter of first impression in this circuit, the issue of confusion in terms of standing has been recently addressed. Allegations of confusion are not sufficient to confer standing. The Seventh Circuit recently held this in multiple cases. But what about the Sixth Circuit? The Sixth Circuit has not addressed confusion specifically. There is the difference between Mr. Parker's argument on the Macy case and whether that has application here is there is a different section of the FDCPA invoked in the Macy case regarding potential waiver of rights. Waiver of rights to dispute a debt. The allegations here and the subsections involved here don't have anything to do with the need to assert a dispute and any waiver of the rights to do so. Additionally, here in this case, the thing is for Macy because the plaintiff in that case alleged that there was potential damage in the terms of waiver. Here, there's nothing alleged. We have to look back at the complaint. And the only thing we have is confusion. So I would request that the court look at what the Seventh Circuit has recently held in the form of the Brunette case and the Pennell cases where they stated that confusion doesn't satisfy the requirements of a concrete injury. Even though there may be a substantive alleged violation of substantive rights conferred by the FDCPA, that doesn't guarantee standing. And here, there's no harm as to who they sent the cease and desist letter to and whether that was a mistake or not. There's no harm. They could have fixed that problem very easily. And so if they sent the cease and desist letter to the wrong entity, no consequences would occur at all? There hasn't been anything alleged that there was any consequence that occurred. The potential would be that they continue to get calls on that account. There has been no allegation that they continue to get calls on that account. But Macy spoke in terms of a risk. And it would seem that what you're describing certainly would meet the standard of being a risk that they would be materially affected. That would be the case, A, if they had alleged it, which they did not in this case. But the difference between this case and Macy is that waiver of rights to dispute is different than here where you just continue to get one more call or one more letter or something. There's no rights that you're losing in that instance. So there is no harm. He could continue to not answer his phone and he'd be in the same position as if he had sent the letter to the correct entity. But going back there, the difference is that there was an actual allegation in the Macy case as to what that risk is. Here, there isn't an allegation. And the court needs to look at the four corners of the complaint to make this standing determination. Well, there is an allegation. I said, you know whether the letters that Enpass sent him actually were received by Mr. Ward? I have no indication that they weren't. That has not been rebutted by opposing counsel or Mr. Ward. And it would be his burden to prove that they weren't. And so I don't have anything that would go with that. There's proof that they were mailed or an allegation they were sent or not? Yeah, I mean, there's no reason to think that they were not sent. That happens as a matter of course and it's in the record in terms of their business records that they were sent the copies that are part of the record evidence. So what's your position on the merits? So I was just turning to that, Your Honor. So in terms of whether Enpass satisfies the debt collector definition under the FDCPA, the language specifically states, any person collecting or attempting to collect a debt which was not in default at the time it was obtained. So obviously, we're looking at that specific time frame. Mr. Ward is asking the court to ignore lots of case law that says you should look at an agreement if it exists between the consumer and the creditor. Here, we have a contract. We have a contract between Stonecrest Medical Center and Mr. Ward that states specifically that during the entire time, meaning when they obtain it until some other time which is discussed in the contract, the EBO servicer is handling the account which is Enpass, which is in the affidavit by Enpass' senior vice president. It's not in default. It's not past due. It's not delinquent. It's none of those things. So that is exactly how they handled it and they agreed to handle that from the beginning of receiving treatment. There is nothing in the contract that would indicate that if he did not pay a bill, how could he pay a bill before it's even been billed? The process is obviously and it's described in the agreement that insurance gets billed for treatment that a patient receives and then after that, then it's talked about in the agreement itself, the option to send it to third-party collection which is described as an EBO servicer who is acting as an extended business office which Enpass does. That is all Enpass does. It has this relationship with these medical providers to merely service these accounts and so their relationship is at stake. Mr. Parker mentioned that they have no interest in keeping their relationship and many times patients have multiple accounts with hospitals that they have to go back for recurring treatment. So there's no issue here that Enpass was trying to avoid the FDCPA requirements. It simply wasn't its business model to collect for a period of time where any sort of accounts would be delinquent or go on for a period where they would be considered past due. So as I understand your position, you are a servicer and you are not a collection agent. That's correct. Is there a definition in the statute to distinguish between a servicer and a collection agency? There is not. There's a debt collector and there's a creditor, but the case law has indicated that not all entities that aren't creditors are debt collectors. There is some sort of middle ground and that's why there's been a case-by-case determination in these instances because there's this gap in the statute. And so this word default obviously comes into play so frequently. And so because of that, the courts over the years, starting with the Alibrandi decision in the Second Circuit, have been loathe to haphazardly put consumers in default. That would defeat the purposes of the FDCPA. The FDCPA has pro-debtor objectives, but putting accounts into default would subject those consumers to adverse measures such as credit reporting, interest, late fees. And here, the purpose of using an EBO servicer in terms of the creditor having someone else account as opposed to putting it straight to a debt collector is because they want to give that person an opportunity to resolve their account. Sometimes insurance needs to be rebilled. Sometimes there's a worker's comp issue that comes up. That's the intent of EnPASS being involved is that they are just an outside service provider doing this billing for the creditors such as Stonecrest. There seems to be the suggestion or even argument that really Stonecrest and EnPASS are trying to evade the requirements of the Act in part by having this moving target when it comes to a due date in these billing statements. And that due date, as I recall, changed a couple of times with respect to each of the two services and billing statements. Would you address why that's not like, you know, the sort of indication that maybe there's this intent to avoid the Act? Sure. There is no intent. The business model is such that the first few bills are only being sent by EnPASS. The EBO servicer is merely handling the account for approximately 90 days. And the intent is to not put accounts in default at that time because they want to give people opportunities to resolve their account. Sometimes, for example, letters aren't received the first time. They follow up with phone calls as a result on a few occasions. These two accounts were specifically programmed to have two letters be sent and one or two calls be made, and that's it. The target issue, you mentioned, Your Honor, in terms of the due date, the letters simply put a date about 15 days out to be a target to have someone respond, to give someone an incentive to respond. But in the terms of what's default, that time period doesn't necessarily have any relevance to under the FDCPA because all that matters is the time, which the account was obtained by such entity. And here, EnPASS obtained it before it sent its first bill. So at that point, there was nothing past due. Merely insurance had been billed, and they just began their collections process. Is there anything in the billing statements or really elsewhere that would set forth the date of default? So, no. The tracking is this. The conditions of admission agreement specifically said, this is what we're going to do. We're going to send it to the EDF servicer. They're going to work it for a while. They're going to give you a final notice. And when we get it back from them, then we're going to put it in default. And that's all laid out in paragraph six of that conditions of admission. And the statements that EnPASS sends track that exact thing. There's frequently asked questions that says, who is EnPASS? We're managing the account. We don't call ourselves a debt collector. We don't say, this is an outstanding balance. We merely said, the insurance was billed. Here's the unpaid balance. Please pay it. And then, as the conditions of admission agreement says it's going to do, they also have to send the final notice. They do that in both of these accounts about a month later. The final notice language is just a little bit different. It states, we urge you to take advantage of this final opportunity. So it's nothing inconsistent with what Mr. Ward agreed that would happen between Stonecrest and himself. And that is really the intent, so that they can have an opportunity to see if he's going to respond, if he can pay these balances that remain due, before they take the accounts back, and then determine whether they're going to keep using an EBO service or make a determination that it's in default and send it to a third party debt collector. Does Stonecrest send an initial bill? Typically, Stonecrest will send an initial bill. I can't say that happens in every single instance. Did it happen here? I believe it did, and your honor, Stonecrest records aren't in the record evidence. But the typical process is that insurance gets billed. And then, as soon as that payment occurs, one statement is sent by Stonecrest. And then, when that sits for another couple weeks, they send it to Enpass to just continue working the account. But they don't wait a specific passage of time. They just send one statement and then send it to Enpass to work the account immediately. Well, does Stonecrest have a sort of unfettered discretion to determine when a debt is in default, just by self-declaring it's in default? Well, I don't think it's unfettered discretion because they agreed with the consumer, Mr. Ward, when they potentially would do that. And so, I mean, I don't represent Stonecrest, your honor, but I don't believe the contract gives them unfettered discretion. It says, we specifically aren't going to have your account be considered in default while this EBO servicer is handling it. We're going to give you a final notice. They're going to give you a final notice on our behalf to tell you. And then, only once it's returned, then we can make that determination. But it gives this pretty significant window of time where they specifically say it will not be considered in default during that time frame. And that's exactly how this case was handled. And for those reasons, that's why I don't believe this was in default. Enpass isn't subject to the FDCPA. And also, I don't believe standing exists in this case. I appreciate your time. Okay. Thank you, Ms. Meadows. Mr. Parker, you have six minutes for rebuttal. Thank you, your honors. If the record was, as my friend for Enpass just stated, they would have a very good argument that their bets here were not in default. But Enpass has misstated the record pretty badly on two very important points. First, the conditions of admission do not require Stonecrest to use Enpass. And they are completely silent on what happens if they do not use Enpass. And Stonecrest's agreement with Enpass itself, the agreement between the creditor and the debt collector, makes clear that Stonecrest has the authority to retain any account it cares to in its own hands, and that means that it could sue on that account because it wouldn't have sent it to Enpass, and therefore it wouldn't be required not to sue on the account by its agreement with plaintiffs. There's an entirely legal way for Enpass to do what it wants to do here. All it has to do is provide that a debt will not be in default for, say, 180 days or, say, until after it has been serviced by an EBO servicer. But here that's not what the contract says. The contract says that if we choose to send it to an EBO servicer, it won't be in default while it's with the EBO servicer. It says nothing about whether or not it will be in default before it's sent or whether it will be in default if it's never sent. And it makes clear that the contract does not require them to send it to an EBO servicer. But here it was sent. And once it was sent, and if the agreement says you're not going to be in default if it is sent to an EBO servicer, why isn't that the end of the case? Your Honor, because the statute says that all that matters is when it is obtained by the servicer. If sending something to a, sorry, if you have a contract that says that if I send it to a debt collector, hell, if you have something that says if I send it to Midland Funding, it will not be considered in default while Midland is handling it, then you could do that with literally any debt just by sending it and putting it back out of default. It could have been serviced by another debt collector before that. There could have been all sorts of other indicia. And it would essentially abrogate this Court's holding in Bridge v. Ocwen and any number of other holdings, including Allen Brandy cited by Appellee Enpass. The problem is that you can't just take something back out of default when it was already in default before it was sent. And that's what happened here because they had the present right to sue, which is the definition of default. It's the only definition that's been offered by either party of the plain language of the statute. And so it's the only definition that this Court has to work from. I would also point out that Enpass does have unfettered discretion here because, once again, they can choose to send it or not to send it. And they can – they essentially, therefore, covenant not to sue while it's with Enpass. But the statute of limitations for their breach of contract action runs from the second that they calculate the charge for the service due. No one is going to argue, I think, that the statute of limitations would run from after it was sent to Enpass. Enpass certainly wouldn't – Stonecrest certainly wouldn't argue that in any collection action they attempted to bring. So it makes very little sense to make plaintiff liable for the consequences of – or to punish plaintiff, revoke his rights that he would have when the debt is in default, and yet allow Stonecrest to treat it as in default at whim. The FDCPA, according to this Court, its coverage is not defeated by clever arguments or for technical loopholes that seek to devour the protections that Congress intended. That's from Bridge v. Ocwen. If they want protection from the FDCPA, if Stonecrest and Enpass want protection from the FDCPA, the consumer must be protected in the way that Congress envisioned when creating the exception they are seeking to access. And the way that Congress envisioned it is that the debt would not be in default, meaning that the consumer would not then be liable for the consequences of default. And the consumer here was liable for the consequences of default from the moment that the charge was calculated. I would also point out that Enpass states that there is a gray area between debt collectors and collection – and original creditors with respect to collecting a debt. This Court has explicitly stated that that's not the case. That's the holding of Bridge v. Ocwen. This Court's most – really, it's only on-point decision here. The direct holding of that case is that there is no gray area. One must be either a creditor or a debt collector, and there's nothing – there is no third option. And here it is very clear which one Enpass is more like. It is not like a creditor. It doesn't have ongoing relationships with consumers. It has an ongoing relationship with Stonecrest Medical Center. So the entities that Congress intended to regulate are those who have more important relationships with the creditors than with the consumers, and they intended to exempt those who have more important relationships with the consumers than with the creditors, essentially, because the reputation matters more to those ones. That's why good sellers and other original creditors, people who extend credit and have to deal with consumers for a long time, are exempted. Also, it's worth noting on the standing question, Enpass appears to be working from the original complaint and not the amended complaint because they cite a handful of paragraphs that state all that's alleged is confusion. If one looks at the amended complaint, I recommend looking at paragraphs 12 through 20. There are, in fact, specific allegations about whether a letter was sent and whether it was sent to the wrong person because of confusion. I'll read a couple of those. On December 28, 2018, Legal Rights Advocates, PLLC, sent a cease and desist letter to Enpass Solutions at the address listed on the Better Business Bureau website for Enpass Solutions, LLC. Because the defendant did not state his true legal name, Enpass, Inc., in its voicemail messages, Plaintiff's cease and desist letter reached the wrong entity. That's from the amended complaint. There are 10 paragraphs of allegations directly responsible. So what is the harm when the letter went to the wrong entity? Your Honor, there are a couple of harms. First, Plaintiff suffered actual economic harm, a tangible harm, independent of statutory standing, simply because he lost a bargain for economically valuable benefit, namely his counsel's time. Also, the harm is that he continued to receive calls after this, so he was unable to enforce a right that Congress was entitled to elevate to the level of a cognizable right under Spokio because it's directly analogous to traditional intrusion upon seclusion. If the letter had been received by the correct entity, then there would have been fewer calls? That's correct, Your Honor. There would have been at least one fewer call. The record only shows one additional call, but yes, there would have been at least one fewer call.  That's correct, Your Honor. There wouldn't have been an invasion of privacy such as Congress was entitled to and did elevate to the level of a cognizable injury. Okay. That appears to complete the questioning. Counsel, thank you for your arguments this afternoon and for participating by Zoom. We very much appreciate that. The case will be submitted. Step forward and you may call the next case. Thank you. All right. 2018-04, Don Huey v. Anthony Eastlick, oral argument not to exceed 15 minutes per side. Ms. Pizzoli for the plaintiff appellant. Good afternoon, Your Honors. Tina Pizzoli appearing on behalf of Appellant Don Huey. This is an appeal from the lower court's decision granting qualified immunity to defendant, State Trooper Eastlick. It's on appellant's claims of the use of excessive force during the handcuffing process and excessively tight handcuffing. It is not disputed that this case, just briefly some facts, involves the arrest of appellant on a fairly minor nonviolent offense. She had the wrong tags on her vehicle. During this arrest, she did not resist, threaten, or attempt to flee from the officer at all. She testified that because of the handcuffs, she had sustained being too tight. She had sustained marks to her wrists and that she suffered a torn rotator cuff. We submit that the lower court committed reversible error in granting qualified immunity as there are genuine issues of material fact, which must be decided by a jury. In this case, it appears that the lower court relied on the video, the audio, and only part of the appellant's testimony. However, as the court is probably aware in viewing the video, the video is only a personal video. It does not show the entire handcuffing process, nor does it show the handcuffing of her left arm, which is an issue in this case. Additionally, as this court probably is aware from the audio, there are portions of the audio missing. In fact, I believe it's at 26 minutes and some seconds that it goes out completely. And it's interesting because the appellee testified that when the video and audio were on, he actually heard Ms. Huey tell him that the handcuffs were too tight. This was outside of the car, is his testimony. And he claims at that point, he checked the tightness of the cars. We don't hear that on the video, even though that's his testimony that that had occurred. So there is traffic noise as well that prevents us from hearing everything that takes place on the audio. Moreover, the lower court seemed to focus on the testimony of the appellant when she was asked a question as to whether she suffered any injuries to her wrist. She did say no at that time. However, the deposition continued. And when questioned as to the injuries she sustained, she specifically testified that when she went into triage and the officer finally took the handcuffs off, the triage nurse said, what's wrong with her arm? What's wrong with her hand? And because she couldn't bring it around and she sees the rings around my wrist, from where the cuffs were on too tight. And he tells her that's from the cuffs. And then she was questioned some more about that. And she said, yes, but she had rings and she could see them. So the only claim that you have about the handcuffing being too tight is the rings around the wrist. Is that correct? And the left shoulder rotator cuff problem is really because of the way that the handcuffing occurred with the arm being pulled back behind her. That is correct. And segmenting the two claims. That is correct, Your Honor. It does not appear that the lower court gave any credibility to a poet's testimony that she had these marks on her wrist from the handcuffs being too tight, which she specifically testified to because the handcuffs were too tight and the pain in the shoulder and her torn rotator cuff. We submit that this amounts to credibility determinations in a weighing of the evidence, which is improper at the summary judgment stage. We submit that summary judgment here was not appropriate as the evidence was also not viewed in a light most favorable to the appellant. Now, when... Ms. Lilley, it's just cool. Um, so you're taking the position that marks alone, I mean, these marks on her wrist that were caused by the handcuffs are a sufficient injury for an excessively tight handcuffing claim. Is that the position? Yes, Your Honor. Morrison v. Board of Trustees of Green Township, as well as Uzo v. City of Dearborn Heights, as well as even the case of Pastraza v. City of Troy. We believe that marks on the wrist create a genuine issue of material fact at the very least. As to whether there is an injury to the... Some information. Okay. Correct. You know, I have a question. As to her shoulder, how long after this incident did she go to the doctor about her shoulder? Her testimony was she went within the week. Correct. Medical... Then according to her testimony at the emergency room when she was there on the date of this incident. But they were evaluating her for a psych evaluation and they said that's not what you're here to be treated for. But she testified she made complaints about the shoulder pain several times to the hospital. And then she went to a doctor within a week? Within a... Yes, that is her testimony. How much later was the surgery for her left shoulder? Well, they tried to treat it conservatively, it's my understanding. And it was, I think, and I think it was within the year, if I'm not mistaken. But I'm not guaranteeing that. Are her medical records in the record other than... I know there's one doctor's report from the other side, but are her medical records in the summary judgment record? There is one medical record that we attached to our response to the motion for summary judgment. Is that... What record is that? That is one from the surgery. Okay. And I just saw one page of that record, am I correct? That is correct. If I may continue, unless there's other questions at this point? Okay, thank you. You know, there's no dispute, the law is clear that there's freedom from excessively forceful handcuffing and unduly tight handcuffing. And here, appellant meets all requirements for the unduly tight handcuffing. There's no dispute. She complained about the injuries to the officer. And I think the lower court made some mistakes in the opinion in terms of when those complaints were made. The court indicated in its opinion that it was on the way to the hospital. That was not the testimony. The testimony was when she got in the car. The testimony was also when she was outside of the car, getting in the car, she made those complaints. So there's a number of facts that are not quite correct in the lower court's opinion at all. In any event, there's no dispute that the appellant complained that the handcuffs were too tight and that appellee heard this. He admits that he heard this. And... Did she also complain about the shoulder pain? Because she told us that the only result of the wrist being... Of the handcuffs being too tight was the wrist problem. But she also said that her shoulder was hurting, right? That is correct. And we should look at the... As the argument that we should look at the claim as to the shoulder as part of the handcuffing process, that the handcuffing process was excessively forceful? Yes, during the handcuffing process. So we don't need to segment. Do we segment these two claims, the rotator cuff claim and the too tight handcuffs or marks on the wrist claim? Or is that really all kind of non-claim under excessive handcuffing? Maybe it doesn't make a difference. Yes, I don't think it makes a difference. But I think it can be analyzed under being one claim. It was part of this handcuffing process. And I believe when looking at her testimony and taking it as two for purposes of the motion for summary judgment, there is at least a genuine issue of material fact that must go to the jury to decide based on the testimony. There can't be any credibility terminations here. And that's what happened in the lower court. What do you make of the fact that the defense has a doctor who says that the injury to her shoulder couldn't possibly have occurred from the way the handcuffing took place? He has a letter from the doctor, question of fact. She said it did, question of fact. She had surgery. She complained of pain during the incident to the officer, to the hospital. And that she had the surgery, went to the doctor, question of fact for the jury to decide. Thank you. Okay. You'll have your full rebuttal time. Mr. I don't know if it's pronounced Hugh or Hud, so I apologize. It's actually Hoody, Your Honor, but either one's fine by me. It's spelled funny. You may proceed. Thank you, Your Honor. May it please the court, Assistant Attorney General Dan Hoody appearing on behalf of Trooper Eastlick. The court should affirm the opinion of the district court for two reasons. One, that there's no genuine issue of material fact as to the tightness of the handcuffs. And two, because there's no genuine issue of material fact regarding the way in which plaintiff was handcuffed. I'll start with the second of these two issues, that there's no material question of fact regarding the way in which Trooper Eastlick handcuffed the plaintiff. Here, plaintiff failed to show that Trooper Eastlick employed any objectively unreasonable use of force against plaintiff in the process of handcuffing her, as would be required under Grand v. Connor to support an excessive force claim. It's not disputed that this court must review the facts in the light most favorable to the would require that we accept the plaintiff's version of the facts almost wholesale. However, in Scott v. Harris, the Supreme Court determined that the Supreme Court could disregard the plaintiff's version of the facts if those facts were plainly contradicted by the record. The requirement being that there not be no disagreement as a fact, but no genuine issue of material fact. Here, any allegation that Trooper Eastlick used any objectively unreasonable force against the plaintiff is plainly contradicted by the dash cam video. I didn't see on the dash cam video any indication of what was happening to the plaintiff's arms when she was being handcuffed. Was there video of her arms as she was being handcuffed? Well, Your Honor, there's no video of her left arm during the cuffing process, but at all relevant moments other than possibly seconds, her right shoulder, arm, hip, and leg are in the frame at all times during the cuffing process, which begins at approximately the 15-minute mark where you can actually see her bring her right arm back to begin the cuffing process. Okay, but the problem is her left shoulder is the one that she's complaining is the one that is the problem, and I didn't see the left side at all. Am I wrong? No, you're not wrong, Your Honor. However, I would posit that here, plaintiff is alleging that Trooper Eastlick pulled her arm hard enough and twisted it hard enough so that it tore her rotator cuff and requiring shoulder surgery. At no time during the video showing did it show any action on the right side of her body to suggest anything so violent was happening on the left side of her body, Your Honor. I don't think that any reasonable juror could construe this video as showing something so gratuitous on the left side and not having any indication on the right side of her body while she's being cuffed. But she said that she complained right away that her arm was hurting, her left arm was hurting her. And as I recall in your client's deposition, at the end, he agreed that his police report had said that she complained right away while she was getting into the police car that her left arm was hurting. Am I correct on that? Your Honor, that's my understanding. It should be noted, though, there's no requirement that there is... Subjective feelings of pain are not sufficient to necessarily indicate that she has either suffered injury or that the actions of the officer were objectively unreasonable, given the facts and circumstances. Here, as plainly showed by the video, Trooper Eastlick opens the door, plaintiff exits her own vehicle under her own power. At the 15-minute mark of the video, at 1503, as stated, she puts her right hand behind her back and the cuffing process begins, during which time the audio is a little bit hit or miss outside. But after immediately following the handcuffing process, you see the plaintiff being guided back to be seated in the front seat of the patrol car by Trooper Eastlick, during which time there's clearly no visible indication of any discomfort. She's walking upright, she's not favoring any part of her body, and she returns to the patrol car. But you're ignoring that both she and the trooper say she said that she was having shoulder pain right then. Well, Your Honor, I believe the issue isn't so much whether she did or did not allege shoulder pain in this matter, it's whether his actions were so objectively unreasonable that a reasonable officer on the scene would be put on notice that what they did was unconstitutional. Here, I think any such supposition is plainly precluded by the clear video evidence. Again, which shows a nonviolent, completely normal nonviolent altercation between Interusty and Trooper Eastlick. It should also be noted that in the 10 minutes following the arrest, while she's sitting in the front car waiting for her car to be towed, she mentions she's conversational with Trooper Eastlick in that she's asking about where her car might go, she's concerned about her present employment, she's concerned about and they discuss other matters. However, during that time, other than this alleged brief interaction of where she said her shoulder may have hurt, there's no other indications of any pain on the part of the plaintiff. Clearly, Trooper Eastlick, under O'Malley v. City of Flint, would reasonably have thought that his actions were consistent with the constitutional rights of the plaintiff to be free from excessive force in this handcuffing process. As this court determined in Costrea v. City of Troy, even for nonviolent misdemeanor actions, the handcuffing process itself is objectively reasonable. So the fact that Trooper Eastlick handcuffed the plaintiff is, as a matter of law, objectively reasonable. It's simply a matter of whether the plaintiff can or cannot show that any of his actions during that cuffing process were so forceful or unduly violent as to cause an excessive use of force. Here, that's plainly contradicted by the irrefutable video evidence as reviewed by the district court. What do you do with the police report? The police report says in two different instances that she complained of pain in her shoulder. Again, Your Honor, regardless of whether she complained of pain in her shoulder or not, it's not so much that she felt pain. It's whether the actions of the officer were objectively unreasonable in light of the circumstances. Here, it's entirely possible that she may have had some subjective feeling of pain. However, Trooper Eastlick, as long as his actions were objectively reasonable given the facts, that's unfortunately a situation that can't be helped by an arresting officer. It comes down to the balancing of the equities between the need for an officer to be able to conduct their duties and the rights of a plaintiff or the rights of an arrestee to be free from unnecessary and excessive force. Here, we believe that the district court was correct in its ruling in granting summary judgment based on the excessive force claim as there was no showing of material fact with respect to any unreasonable use of force on the part of Trooper Eastlick. I guess you've covered this already, and Judge Moore has made reference to it, but Ms. Huey-Dust did complain four or five times after the cuffing, as I understand it, and she's placed in the patrol car, that her shoulder was hurting. Your argument is essentially that doesn't create a disputed factual issue as to whether the handcuffing was excessively forceful. Not in light of the indisputable video evidence, Your Honor. The mere fact that even if she did, in fact, feel pain from the cuffing process, a subjective level of pain isn't sufficient enough to show that the actions in the cuffing process were objectively unreasonable. But in looking at the video, my recollection is the officer's body obscures much of the handcuffing process. So it's hard to, I mean, I don't know that a reasonable, objective person looking at the video, which is asking the question, could conclude that it was not excessively forceful. So is the video that clear? You're arguing that on its face, there would be no determination of objective unreasonable force. In this instance, Your Honor, I believe it would be as the district court reviewed the video and found the same. Again, this is a matter of a reasonably significant shoulder injury being complained of by the plaintiff. As you'll see, as you see in the video, there's a sizable size discrepancy between the plaintiff being arrested and Trooper Eastlick. Again, at no time do the portions of the plaintiff that you can see on video indicate that any extreme violence or any undue violence or undue force at all, irrespective of the word violence, any undue force would be using on her left side of her body to indicate that it certainly was not indicating her right side of her body, that no, I don't believe that any reasonable juror could see that videotape. And the immediate subsequent walk back to the car and determined that she, that the use of force by Trooper Eastlick was objectively unreasonable. Hypothetically, couldn't there be a video that would have a police officer having his body obscure the full view of the person being arrested? And hypothetically, the officer could dig his hands into the arm of a person to get control over that person. Hypothetically, wouldn't that be a fact question for a jury to decide whether there was objectively reasonable force in that hypothetical situation? In theory, Your Honor, in that hypothetical situation, I suppose it could be. However, it's important to note that no such allegations of misdeeds on the part of Trooper Eastlick have been indicated here. The plaintiff's testimony is that he merely pulled and twisted her arm to place it into the handcuffs, which I would posit is necessary to place her in the handcuffs. All right. The question is, was it excessive twisting though? I mean, was it more force than necessary? She wasn't resisting, was she? No, Your Honor. She absolutely was not. And in fact, that's the entire contention of Trooper Eastlick. This was an entirely cooperative interaction between the two individuals. It's an uneventful arrest as shown by the plain viewing on the videotape. She's clearly not in any pain when she's walking back to the arrest. There's no visible showing of jerking motions. There's certainly no indication of undue force being issued against the plaintiff. But she does start complaining about the handcuffs being too tight, according to her. Yes, Your Honor. And if I could, with respect to the tightness of the handcuffs, the plaintiff's arguments clearly fail under Baines to show a sufficient inquiry with respect to any showing of actual harm, any showing of actually injury to her wrists. As this court determined in Smith v. Athens County, the plaintiff complained of was not sufficient to overcome summary judgment in showing that redness of the wrist and an elevated heart rate were not sufficient alone to show an actual showing of injury. It may be instructive to look at some of the cases that were, where actual showing of injury was satisfied under Baines to show the difference, the factual difference in this matter. In Alzhevier City of Dearborn Heights, this court did consider the redness of the plaintiff's wrist, but it also made clear that it was only considering the redness of the plaintiff's wrist. It was not considering the further allegations of carpal tunnel syndrome. In Bolin v. City of Kegel Harbor, this court entertained the idea of bruising as being sufficient injury to satisfy the Baines factors for showing of injury. But again, here we have no such showing. We merely have redness around the wrist without an indication of bruising. We have, my understanding is that she says that there are rings around her wrist. Is that correct that she says that? She did say that, Your Honor. And, but I would argue again, rings around your wrist and redness would go hand in hand and still not be sufficient. If I remove my wristwatch, I will show redness and a ring around my wrist. However, there's certainly no injury from having worn my wristwatch throughout the day. For those reasons, Your Honor, this court should uphold the ruling of the district court. Thank you for your time. Thank you, Mr. Huday. Ms. Bozzola, you've got five minutes of rebuttal. Yes, I don't think I will take that long. My understanding of an excessively unduly tight handcuffing case is you need three plaintiff's complaints of it. The defendant hears it and that there's some injury. I think it's clear in this case, taking all the facts as true for the non-moving party, that the appellant has clearly met those requirements in this case and that reversal is required. What exactly does she say is the harm that happened to her wrist? The harm is, well, as she described in her deposition, that she couldn't move her arm when she got to, when the handcuffs were finally taken off. She could not move her arm and that she had the red rings around her wrist and that she suffered a, you know, subsequently was diagnosed with this shoulder tear. But on the rings around her wrist, she specifically said they're red rings. I have to double check her testimony. Let me go to that page number in her deposition. But she definitely said she couldn't move her arm when the handcuffs were finally taken off. We're talking about the wrist at the moment and my understanding was she said rings around her wrist that she noticed that at the hospital when the cuffs were taken off. And I guess the question is, we have cases that say bruising is enough. But are these rings bruises or is there no evidence in the record as to what the rings are? There's no evidence in the record as to exactly what the rings are. The closest we got to that was when she was describing how the nurse was saying, you know, what happened to her arm, what happened to her hands, and noticing that she couldn't move her arm and that she has the rings around her wrist. And I can't find the specific testimony right now, but it is in the record. You know, that means there's questions of fact still regarding this injury. If we don't know more about it, but I thought marks were, you know, sufficient to go to a jury as well on the excessively tight handcuffing case. And I also think because we don't have the full video and audio, again, it would be speculative to, and we would assume what's going on on the left side. There are genuine issues of material fact here. There's just too many questions to find qualified immunity for the officer at this time. This is a case where at this point with what's in the record and all reasonable doubt being given to the appellant in this case, it has to be decided by a jury because there are genuine issues of material fact. Thank you so much for your time today. Okay. Thank you, counsel, for your arguments this afternoon. We really do appreciate them. The case will be submitted. And Mr. Ford, you may call the final argued case. Thank you. All right. Grabbing counsel for the third case. Stand by. Okay. Come over all the way. Okay. Counsel Sheckler. Can you hear me? Okay. I can. Thank you. 20-1607 United States of America versus Shershan Dontrell Burris. Oral argument not to exceed 15 minutes per side. Mr. Tableman for the defendant appellant. Good afternoon. If it pleases the court, my name is Kenneth Tableman. I'm appearing here on behalf of Mr. Shershan Burris on this direct criminal appeal. This case is a sufficiency of the evidence appeal. There are three counts involved. And the facts are somewhat interrelated. But suffice it to say there was a jury trial here. The defendant pled not guilty. And to start, there was a charge of conspiracy. A charge of distribution on a specific date. And a charge of possession with intent to distribute on another date. In this case, starting with the conspiracy charge, Mr. Burris submits that there was not sufficient proof of any agreement between him and his alleged co-conspirator, Mr. Davis. The pattern of investigation in this case was that an officer, an undercover officer would call a specific phone number. And Mr. Davis initially met with him and provided him with drugs. He called the number again. Mr. Davis came again. He called the number again. Mr. Davis came again. And on the next transaction, the October 8th transaction, which forms the basis for one of the counts, he alleged that Mr. Burris showed up and sold him drugs. Mr. Burris allegedly came in a pickup truck. And the registration of that truck traced back to Mr. Burris. There was another transaction involving Mr. Davis. And then a final transaction on the same day as the final transaction, there was the execution of search warrant at the residence in Benton Harbor. Officers there saw Mr. Burris running from the back door of the residence and claimed that in the vicinity of the fence that he jumped over, they found nearly 10 ounces of methamphetamine. When Mr. Burris was finally arrested in this case on the 23rd, in his left pocket was a cell phone and a small amount of cash. His right pocket, and he was wearing sweatpants, was a handgun. No one said that they saw him running with the package of methamphetamine that was found in the fence line. What's significant about the proofs in this case is that there's no evidence, no direct evidence of a conspiratorial agreement between Mr. Davis and Mr. Burris. There's no text messages. There's no conversations. There's no finding of the two men together. None of that type of evidence. The only evidence that connects, potentially connects Mr. Burris would be this common phone number. And I would submit that it's just not enough to prove the agreement. What was the agreement? What do we know about the use of this phone number? Whose phone number was it? We don't know any of those questions. And Mr. Burris suspectly submitted a conspiracy charge that it required the jury to pile an inference on top of an inference to come up with the idea that there was some agreement. Well, except that after Burris appeared on, say, the third time, on the other subsequent three times, they kept seeing Davis was observed going in and out of Burris' house, right, to get more drugs. Well, they did see Davis going to the house and returning at times with drugs. But what do we know about Mr. Davis? Do we know anything about Mr. Davis' relationship to Mr. Burris in the house? Was he living there? Did they have to find separate rooms? Did Mr. Burris know that Mr. Davis had drugs? And even if Mr. Burris knew that Mr. Davis was retrieving drugs from his home, even if he approved of that, what's the agreement? What's the conspiracy? The court has held in other cases that where persons know that each other may be selling drugs or possessing drugs, there still has to be an agreement between them. And what's the agreement? How do we come to an agreement? Well, could there be an agreement to engage in the sale of drugs? What would be the... The activities that they've engaged in show circumstantial evidence. Well, I mean, circumstantial evidence could be enough. Facet agreement could be enough. You have to look at what the people actually did. And you have to start with some type of ongoing agreed behavior. So the inference is, I guess, that's being urged here is that because Davis is seen in the vicinity of Burris' house in connection with some drug transactions, that Burris must join that in some fashion. And what is it that Burris has done that shows that he joins that? Why is it just as consistent with the idea that, all right, this person that I know is doing drugs or selling drugs, I'm not going to stop them. I might even approve of it. But what's the agreement? What is your best case that you found that has uncomparable circumstances that held the evidence was insufficient? Well, I like the Gibbs case, for example, which was the short north posse, I think, in Columbus, Ohio, where we had a number of people that knew each other, associated with each other, admitted that they possessed and sold drugs, sold drugs in the same vicinity, from time to time, bought drugs to and from each other. But there was no showing that they had entered into a conspiracy. In that case, the conspiracy was alleging that this group was excluding all other dealers from their territory. There's no showing they joined that. So I thought that was a pretty good case. Assuming that we agreed that that was a good case, is there a fundamental problem that your client did not move for a judgment of acquittal? Well, it appears to me under the court's current precedent that we're stuck with a higher standard of proof, but I still think it would amount to plain error. Sufficiency of the evidence implicates the due process clause. The fundamental value that we have in our justice system, that we're not going to take away someone's liberty unless the government has proven them guilty of every element of the crime charged. And I would submit that if the court were to agree with me on a conspiracy charge, that that would satisfy the plain error standard review. Tell me this, would we as a panel be able to do anything about that, even if we agreed with your position, or would it have to require an en banc hearing of this court? Well, I tried to argue my reply brief, and I do argue my reply brief, that if you read Jackson v. Virginia, it can be read to eliminate this devoid of any evidence rule  that existed before Jackson v. Virginia. Yeah, but Jackson v. Virginia was 1979, and we've had subsequent Sixth Circuit cases that say it's still the miscarriage of justice devoid of evidence standard. So we can't overrule a prior panel, can we? You cannot. But I suppose the question is whether those prior panels actually considered whether or not both Jackson v. Virginia and Olano, which sets up the plain error standard, whether those two cases were ever considered by a panel explicitly on the situation where someone fails to move for judgment of acquittal, but is challenging the sufficiency of the evidence afterwards. Are there any cases that you know of that have explicitly addressed whether Olano and Jackson may have changed this devoid of evidence standard that we seem to have applied? Well, not in the Sixth Circuit, Your Honor. There's a dissent and an en banc decision in the Delgado case that's in my brief that has a pretty extensive analysis of Jackson and Olano and how that may defeat the devoid of evidence in the miscarriage of justice rule. And we don't have any panel decision that addresses the Delgado? I'm not aware of any, Your Honor. Was Delgado a Fifth Circuit case? I don't know, Your Honor. I'd have to check. I think the majority actually said that the miscarriage of justice standard was still okay in the Fifth Circuit, didn't it? Yes, yes, they did. The dissent has a very extensive analysis and highlights the circuit split. And I think, of course, I'm going to promote your dissent view. Of course. I think it is well taken. Thank you. I see my time is up and I'll wait for the full counsel's argument. Thank you. Thank you, Mr. Tableman. Ms. Scheffmer? Thank you. Good afternoon, Your Honors. Renee Scheffmer on behalf of the government. In this case, the government is arguing that the Sixth Circuit law is clear that the standard here is the miscarriage of justice. And that is because the defendant not only did not make a Rule 29 motion, but actually did so after the district court expressly advised him or asked him, do you want to make a Rule 29 motion? At that time, he said, at this point, I do not. And that's on page 903 of the second volume of the trial transcript. So we have a clear waiver in this case. Somebody didn't forget to do it. They didn't do it intentionally. Now, in this case, the defendant is arguing... What on earth, if I may ask, and I know I'm asking you to speculate, but what on earth could a defense lawyer's reason for not moving for judgment of acquittal be? Your Honor, I have seen this happen before. And if the defense counsel believes that the evidence is there, sometimes they don't move for the Rule 29. As attorneys, you and I may sit back and say, why wouldn't you just move for it as a general sense so that you preserve an issue? But I've seen people not do it. I can't get into this defense counsel's head and explain why he did it in this case, but it was brought to his attention by the district court. And he expressly did not want to raise it at that time. Do you consider that a waiver, even if Mr. Tegelman has a good argument that, hey, it's too bad in this case versus waiver? Well, I've had other cases on different issues where there is a distinction between what is a waiver and what is a forfeiture. Sometimes in the cases, it's not really clear whether it's a waiver or a forfeiture. But to me, a waiver is knowing an intentional waiver. You were asked specifically, do you want to raise the Rule 29 motion now? The defense counsel says no. That's not something that somebody just forgot. That's not something that I would consider something forfeit. In other words, just not raised. When you make a knowing an intentional waiver of a constitutional right, we accept waivers for all kinds of waivers of constitutional rights. And I don't see any reason why you shouldn't be able to waive any right, including the right of Rule 29 to make that at the end of the case. In this case, because they didn't make it, it does limit the standard of review before this court. And it makes sense because we have Rule 29 for a reason. And the reason is to let the district judge determine based on having just heard the same evidence that the jury heard, whether or not the district judge believes there was proof beyond a reasonable doubt that a rational juror could find that. By denying the district judge that opportunity to review what he has just sat and listened to, you are now bringing a cold record before an appellate court and asking an appellate court to make the exact same ruling. And when the appellate court rules, the appellate court is looking at words on a piece of paper, whereas the district court is looking at the witnesses as they testify and is able to make the same types of analysis about how testimony came out before a jury that sometimes is not clear during reading a transcript on appeal. But wouldn't it be exactly the same situation if the motion is made and the district court says, I deny the Rule 29 motion, go ahead with the remainder of the case. And in my hypo, if an acquittal motion is made and denied by the district judge with no explanation why he's denying it, wouldn't we be in exactly the same spot on appeal that we would have to be making a determination based on the cold record? Yes, we would. If there was no actual ruling, but that isn't- If there's a ruling, it's adverse. If there's an adverse ruling to the defendant with no explanation, we are still in the terrible situation you're describing that we have to be doing it on the cold record. Yes, you're absolutely correct. But in this case, even just looking at the cold record in this case, I believe that the evidence presented at trial does meet the elements of the offense with respect to the distribution of methamphetamine. There was a direct basic hand-to-hand buy by the undercover police officer. He called the number and instead of Mr. Davis, it was Mr. Burris who came. That's direct evidence of Mr. Burris' guilt. And if the jury believed the police officer, there's really nothing more to say. With respect to the possession with intent to distribute, on that occasion, the defendant was- After a deal with Mr. Davis, Mr. Davis went to the defendant's house and he didn't go inside and didn't go anywhere but the front yard because the police came to execute a search warrant. The police observed Mr. Burris running outside of the house through the backyard and jumping over a fence and then he was arrested a couple blocks later. When they saw him running through the backyard, he had what one of the officers called his left hand up in a football carry. His left hand was up against his chest and his right hand was in his right pocket. He was wearing sweatpants and they could see his right hand and where it was but because of the way that they were angled coming around the back of the house, they couldn't see his left hand. But when he paused at the fence and he eventually got over the fence, they then went to the fence and saw that in his line of fight, there at the fence was a black leather bag that was open. It was a zippered bag and it was open and inside that was a closed plastic bag of methamphetamine. In this case, because of his flight, because the methamphetamine was in his flight path because of the way the officer saw him running from the house, there is evidence that he did possess methamphetamine on October 23rd with the intent to distribute it. And because there was a stipulation in this case that it was 275.6 grams of methamphetamine and that was far too much for personal use quantity, the intent to distribute is also established. So the hard one is the conspiracy, which is the claim that your opponent is focused on. Exactly, and I'll go there next. So in the final of the three counts that he's challenging, the conspiracy count, this is fairly, it's fairly simple fact pattern. The detective was calling the same phone number and during the course of this case, he called it six different times and did six different deals. On the first two deals, excuse me, Mr. Davis showed up and he did the transactions with the undercover police officer. On the third deal, which was October 8th, after calling the same number, it was instead Mr. Burrs who showed up. Excuse me. For the fourth, fifth and sixth deal, it was again, Mr. Davis. I need a moment to get some water. You can do that. Thank you. I'm very sorry. No problem. I'm sorry. You're on the fourth, fifth and sixth. So on the fourth, fifth and sixth time, Mr. Davis again showed up. The pressure is getting to me here. If you need another break, go ahead. If you don't mind, I'd rather get some water. Bring some water into where you are. My wife would say you need a lozenger. I guess it's one of the advantages of Zoom. Yeah. Retreat to where some water or something is. Exactly. Okay. No lozenger, but I think I'm ready to go now. Okay. We've paused the time. You may proceed. Thank you. So during the fourth and fifth deals, Mr. Burrs, excuse me, Mr. Davis was observed leaving from Mr. Burr's house immediately before the transaction and returning there immediately after. And in the middle of the October 22nd deal, which was the fifth deal, Mr. Davis had to go back to the Burr's residence in the middle of the transaction when the undercover police officer asked for more methamphetamine during the middle of the deal. And the officers observed him going to Burr's house about five minutes later, coming back right to the undercover officer and doing the second part of the transaction. So given that Mr. Davis comes and goes from Mr. Burr's house, including on October 22nd, when he went to get additional methamphetamine for that second part of the deal, that only one number is called and either Mr. Davis or Mr. Burr's show up. And then at the time of the execution of the search warrant, which was after the October 23rd deal, it was Mr. Burr's who ran from the house. Mr. Davis did not run from the house. Mr. Davis didn't even get into the house. He got only to the front yard where the police arrested him. So when Mr. Burr's ran out the backyard and over the fence and a couple of blocks away, it was Mr. Burr's flight path that was where the methamphetamine was shown. Why isn't all of this completely consistent with them just being two independent drug dealers as opposed to being in a conspiracy? Well, the primary evidence of the conspiracy is that they're only calling one phone number. If they, for example, if Mr. Burr's were the source for Mr. Davis, then Mr. Burr's would not be showing up for one of Mr. Burr's or one of Mr. Davis's customers to do the deal himself. So that shows that there is some connection. But in addition to that, we have to remember that Mr. Burr's himself testified in this case. And Mr. Burr's stated under oath that nobody could come into his house, that Davis did not live there, and he did not have a key. And if he wanted into the house, he would have had to been knocked and let into the house by Mr. Burr's. Which means basically you would have to, the only inference here is that you would have to think that the drugs are being stored at Mr. Burr's house. And based on Mr. Burr's own testimony, if the drugs are being stored at his house, he is cooperating with Mr. Davis in the possession with intent to distribute and distribution of the drugs. And is cooperation enough for a conspiracy? It is, because as long as he's doing it knowingly, in that he's knowingly joining the conspiracy, we don't have to have direct conversation between evidence of direct conversation. A conspiracy can be inferred from circumstantial evidence, which may reasonably interpreted as participation in a common plan. The fact that the evidence in this case was reasonably interpreted to mean that Mr. Burr's had the drugs at his house, and that's why Mr. Davis kept going there. Would indicate that it was on the plan. So it would be enough if hypothetically somebody allowed a drug dealer to keep drugs at somebody's house, that somebody would be a co-conspirator, in my very short limited hypo? Happens all the time. Stash houses, people have stash houses where their only role in the conspiracy to store the drugs. And what is your best case, would you say under similar circumstances where there's no explicit, direct evidence of an agreement? Your Honor, I didn't look for that. I'm not ready, but I will tell you that there's a Sixth Circuit pattern jury instruction, which is a number 14.05, which was read in this case and is read in all of our cases. And what it says is that the government must prove is that there was a mutual understanding, either spoken or unspoken, between two or more people to cooperate with each other, to distribute or possess with intent to distribute methamphetamine. An agreement can be proven indirectly by facts and circumstances, which lead to a conclusion that an agreement existed. But it is up to the government to prove the facts and circumstances existed in this particular case. So the issue is, could a reasonable jury based on these facts conclude that a conspiracy existed? And I would state that, although the government argues that the standard in this case is miscarriage of justice and void of evidence, in reality, the government would prevail on any of the standards. Even if we used a plein air standard, as suggested by Mr. Tableman, the evidence here is sufficient because we're only looking at basically one reasonable inference. And it's not really for the court, I think, to second guess and choose an alternate, also reasonable inference. If it was reasonable inference for the jury to find, then that would meet the standard of whether any rational trier of fact could find the elements of the offense. What about the Gibbs case that your opponent relies on? As I recall in that case, if I'm recalling the right case, there were a number of different defendants in the short North Posse and some were found to be, there was enough evidence to show that they were participants in the conspiracy and others there was not. I'm not prepared to go through each of the defendants in that case. I would indicate to the court that, you know, it is a fact-based driven analysis. And in this case, the government's facts, as I believe them, the most telling facts are the calling of only one number and having one of two different people show up to do the deal, which would indicate that they're either both using the same evidence to distribute the methamphetamine or that Mr. Davis, who normally has the phone, is directing Mr. Burris to distribute on that one occasion. I also think it's very relevant that Mr. Davis is seen coming and going from the Burris residence. And on the day of the search warrant, it's at the Burris residence where Mr. Burris flees out the back when the police are coming in the front. And he's the one who has the large quantity of methamphetamine. I think these are all very, the reasonable inference here is they are working in concert. If they were not working in concert, there would have been no reason for Mr. Burris to flee out the back door. There would have been no reason for Mr. Burris to show up on October 8th to distribute the drugs. These two things seem to me to be compelling and proof of the reasonable inference. Okay, well, thank you, Ms. Shepherd. We appreciate your argument. Mr. Tableman, you have four minutes of rebuttal. Thank you very much, Your Honor. I think about other conspiracy cases that I read about and participated in. And the government here is asking, was asking the jury, is asking the court, to do a lot of guessing. And I almost think this is a case where you could have an instruction about missing evidence and drawing adverse inferences. Boy, there's a lot of cell phones in this case. Mr. Davis had three of them. My client had one in his pocket. No examination votes. And many, many cases we see circumstances and then we see communications between the participants in the conspiracy to support a conviction. That's not this case. As to the inference about the large quantity of methamphetamine found by the fence line, boy, I don't know how that ties into a conspiracy. And as I argue in my briefs, you could look at that testimony of the officers and look at the black bag and the gallon Ziploc bag that contained the 10 ounces of methamphetamine. And one officer is close enough to Mr. Burr to say he recognized him from prior contact. And yet he doesn't see him carrying a pretty large bag with 10 ounces of drugs in a gallon Ziploc bag. It's just not, the inference there is, that's because he didn't have the bag. And it was equivocal testimony about whether he stopped at the fence or not. One officer said he did, one officer said he didn't. But these are my jury questions. Those are our jury questions. These kind of evidence. Yeah, so in any event, I would submit that you've got to show some kind of agreement before you start saying, we can make an inference that this or that happened. And agreements are usually shown by repeated communications or knowing presence at a scene or something like that. And I just don't think that was here. And I respect what he does. At least as a conspiracy check out, the evidence was insufficient. So what about Mr. Burr allowing Mr. Davis to store drugs in Burr's house? That seems to be the case if Davis goes there all the time to pick up the drugs to give to the informant. That's a tricky one because we know that Davis goes to and from the house. I'm not so sure that it's clear that there would be an agreement to store drugs just because we look at Burr's testimony. After all, Mr. Burr is denying everything. The government has to prove their case. And a person can be a friend of somebody and stash something there. And the other person may not know about it or may know about it and say, that's fine. I don't care, do your thing. And I don't care, but I'm not part of it. And I'm not getting any cut of it or anything. And stash houses, there's usually consideration going back and forth between the people that are there. So I, again, I don't think that tips the scales in particular. I mean, Mr. Burr's fleeing when the police arrive is an adverse fact to your case. And if he was innocent, like you say, and knew nothing about what Mr. Davis had stored there, he wouldn't have fleed. Well, bear in mind, Mr. Burr's is, if I could finish my answer, bear in mind, he's a convicted felon. He's got a firearm in his pocket. He doesn't want to be around the police, that's for sure. Does that mean he's aware? Does that mean he's in agreement to distribute drugs with somebody else? I don't know. That would be my response. Thank you. Okay. Thank you, counsel, for your arguments this afternoon. We do appreciate them. And Mr. Tableman, thank you for taking this case under the Criminal Justice Act. It's a real service to your client and to our system at large. And we want to express our appreciation. Thank you very much for hearing us. Great. Thank you both. The case will be submitted. That completes our argument calendar for the afternoon. Before you may adjourn case. I mean, adjourn case, adjourn court. This audible court is now adjourned. Your honors, I'll disconnect at this time and allow the IT host to assist the panel in beginning its private post-argument conference. Thank you.